FILED
2014 Feb-26  PM 05:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:13-CR-456-RDP-JHE |
| | ) | |
| JAMES DAVID KIRCUS | ) | |

## GOVERNMENT'S TRIAL MEMORANDUM

## I.  INTRODUCTION

Defendant, James David Kircus, is charged in a one-count indictment with knowingly possessing an unregistered destructive device, also known as a "pipe bomb," in violation of 26 U.S.C. § 5861(d).

## II. STATEMENT OF FACTS

On August 12, 2013, at approximately 1:30 p.m., FBI Special Agent Chris Skillman alerted ATF Special Agent Jay Bagwell to a bomb squad deployment to B&D Auto Salvage, located at 3055 35th Avenue North, Birmingham, AL. Bagwell immediately responded to this location and met with members of the Birmingham Police Bomb Squad.

Earlier that day, employees at B&D Auto had discovered several suspicious items in and around the workspace of an employee who was known to have made

bombs in the past. Employees reported that the suspicious items were large metal automobile airbag cylinders that had been altered by James David Kircus.  Kircus was convicted in the Northern District of Alabama in 2007 for possession of firearm by convicted felon, as well as manufacturing/possession of unregistered destructive devices (pipe bombs).

Through interviews on the scene, Bagwell determined that Kircus had not shown up for work that day, and that he was living in a federal "half-way" house called Keeton Corrections, which is located at 1609 7th Street North, Birmingham, AL.  The agent then contacted the U.S. Probation Office in Birmingham and confirmed Kircus's status as a federal inmate. The U.S. Probation Office also confirmed that Kircus was living at the Keeton Corrections half-way house.

Bagwell, along with ATF Group Supervisor Gabriel Mamock, proceeded to Keeton Corrections to make contact with Kircus. Upon arrival, they were met by David Lowe, who is the director of the facility. Lowe stated that Kircus had violated the conditions of the half-way house the previous Saturday when he lied about leaving the facility for work. Lowe then brought Kircus to his office to meet with the agents.

When Kircus arrived, Bagwell advised him that the bomb squad was at his work space examining the modified airbag cylinders. Kircus admitted that he has previously removed the airbag cylinders from vehicles and detonated them for fun.

2

Kircus also stated he has removed the explosive propellant from airbags to light it on fire or to detonate it.

Following this interview, Bagwell contacted the bomb squad technicians on scene at B&D Auto and relayed this information. Additionally, he contacted the U.S. Bureau of Prisons supervisor for the same purpose.  A "pickup order" was immediately issued for Kircus, and he was transported to the Cullman County Jail by the U.S. Marshal Service. A search of Kircus's room at the half-way house was initiated by the staff. Two items of contraband were found as result of the search: a cellular telephone and a soldering iron.

Meanwhile, Agent Bagwell returned to B&D Auto and conferred with FBI Agent Chris Skillman, who had interviewed Daniel Partridge, an employee at B&D Auto. Partridge stated that Kircus had recently asked him to purchase a bomb-making book on the internet, adding that Kircus had made numerous statements about building bombs. Partridge stated that Kircus told him he knew about wiring a timer into a bomb, as well as wiring a cell phone so the bomb could be used to kill someone in a different city. Partridge also stated that Kircus had recently blown up two airbag cylinders in his presence on the property. Partridge stated he had seen other airbag cylinders inside Kircus's toolbox recently. According to Partridge, Kircus had recently stolen a soldering iron from B&D Auto and taken it to the half-way house. Kircus also tried to enlist the help of Partridge in obtaining firearms so

he could "kill the two people who turned him in last time," namely, his sister and his ex-wife. On more than one occasion, Partridge witnessed Kircus attempt to answer classified ads in the "Thrifty Nickel" newspaper with the intention of purchasing a firearm.

Agent Bagwell next assisted the Birmingham Bomb Squad with the collection of evidence. As a result of the bomb squad response, the following items were removed from the scene by utilizing a bomb containment vessel and transported to the Birmingham Police firing range in Trussville, AL:

- Two (2) airbag cylinders that showed indications they had been altered

- Two (2) airbag cylinders that appeared to be unaltered

- One (1) soda bottle containing an unknown red viscous liquid

In addition to these items, four documents were seized showing indications of ownership from a toolbox in the work area used by Kircus. These documents include a birth certificate, motorcycle title, a bill of sale, and Alabama Public Safety documents all bearing the name of James Kircus.

On August 13, 2013, at approximately 8:00 a.m., Agent Bagwell met the Birmingham Police and Jefferson County Sheriff's Office Bomb Squads at the firing range and began "render safe" procedures on the suspected IEDs. An x-ray of one of the altered airbag cylinders confirmed that it had been modified to be an

4

improvised explosive device (IED). The IED was rendered safe by use of a remote control robot. The airbag cylinder had one end that was sealed by using some form of adhesive bonding. After a visual inspection, Agent Bagwell concluded that the other end had been cut open with a saw. The only items remaining inside the cylinder were the detonator and a large amount of airbag propellant that had been crushed into a powder and placed back into the device.

After the Birmingham Police Bomb Squad completed the render safe procedures, Bagwell then collected the following items which were retained as evidence:

- One (1) bag containing red-colored crushed airbag propellant

- Two (2) glass vial samples of  red-colored crushed airbag propellant

- One (1) soda bottle containing a red-colored viscous liquid

- One (1) sample of red-colored viscous liquid

- One (1) bag containing red-colored solid airbag propellant disks

- One (1) airbag cylinder with detonator that contained the crushed propellant

- One (1) airbag cylinder with detonator that contained the solid propellant disks

- Two (2) airbag cylinders that appeared to be unaltered

The evidence was transported to the ATF Explosives Evidence Storage Magazine located in Hoover, AL. Later, this evidence was submitted to the ATF Forensic Laboratory in Atlanta, GA, for analysis.

On August 15, 2013, Agent Bagwell returned to B&D Auto and interviewed other employees that worked with Kircus. He interviewed Gary Mitchell, who stated that Kircus had recently come to him to borrow a hacksaw. Mitchell gave the hacksaw to Kircus and later observed him using it to cut into a metal pipe with wires attached. Mitchell showed the agent the area where Kircus had used the hacksaw. Bagwell observed a worktable with a vise and freshly cut metal shavings underneath it. Mitchell stated that Kircus describes himself as an "Aryan," and he showed Bagwell a license plate that Kircus had displayed in his workspace. This license plate had been defaced with Nazi Swastika symbols, and the words "Fuck America" had been written over the words "God Bless America" near the bottom of the license plate. Mitchell stated that Kircus had recently started to use threatening language, telling him, for example, that he wanted to "kill all those niggers at the half-way house by blowing them up."  Mitchell also stated that, during one recent night after work, Kircus purchased a motorcycle without the consent of the half-way house, explaining that he was planning to escape from custody that night. Kircus told Mitchell, "I want to blow up that bitch in Georgia that turned me in the first time." Mitchell stated that Kircus had confided in him

that he started smoking crack and showed him a pill bottle containing $2,300 that he was hiding at B&D Auto to keep it away from the half-way house. When he asked what the money was being saved for, Kircus replied, "to buy guns with." Mitchell stated that, after that day, Kircus approached him on more than one occasion about buying a gun for him with the money.

While at B&D Auto, Bagwell was approached by another employee, Matt Owens, who stated that he had noticed a red-colored powder on a make-shift work bench near Kircus's work area.  Mr. Owens took him to this area where Bagwell observed a red-colored powder consistent with the crushed airbag propellant recovered from the device during the render-safe procedure. He collected a sample of the powder as evidence, which he later submitted to the ATF Forensic Laboratory in Atlanta, Georgia.

On September 17, 2013, Bagwell met with ATF Explosives Enforcement Officer (EEO) Walter "Lee" Conklin for the purpose of viewing the evidence in this investigation. EEO Conklin and Agent Bagwell fired the remaining two electric detonators from the IED's. Both detonators functioned when an electric current was supplied.  Based on the evidence recovered, it was the opinion of EEO Conklin and Agent Bagwell that the IED meets the definition of a destructive device as defined in Title 26, U.S.C. § 5845(f).

On September 20, 2013, Agent Bagwell received a telephone call from ATF Forensic Chemist Lloyd Erwin, who is stationed at the ATF Forensic Laboratory in Atlanta, Georgia. Both samples of the crushed red-colored powder recovered from the IED, as well as the powder sample found on the workbench in Kircus's work area, were tested for the presence of explosives. All samples tested positive for Sodium Azide and Iron Oxide, which is classified as an explosive mixture under 18 U.S.C. § 841(c).

On September 30, 2013, Bagwell listened to audio recordings of telephone calls made by James Kircus from the Cullman County Jail to his mother, Joyce Bailey, who resides in Georgia. When Ms. Bailey was inquiring about why Kircus was moved from the half-way house to the Cullman County Jail, KIRCUS admitted to her that he had detonated airbag cylinders with a battery.

On October 1, 2013, Agent Bagwell submitted a request to the ATF National Firearms Act Branch (NFA) to query the National Firearms Registration and Transfer Record for any items registered to James Kircus. The search yielded a negative result.

### III. APPLICABLE LAW

26 U.S.C. § 5861(d) makes it a federal crime when a person knowingly possesses a destructive device that has not been registered according to the

National Firearms Act. The essential elements of this crime to sustain a conviction

to Count One of the Indictment are as follows:

<u>Elements of 26 U.S.C. § 5861(d)</u>

<u>First</u>:      That the Defendant knowingly possessed an NFA

firearm[1];

<u>Second</u>:     That the firearm was not registered to the defendant in the

National Firearms Registration and Transfer Record. It does

not matter whether the defendant knew that the firearm was

not registered or had to be registered.

<u>Third</u>:      That the defendant knew of the specific characteristics or

features of the firearm that made it subject to registration

under the National Firearms Registration and Transfer

Record.

## IV. EVIDENTIARY ISSUES

### a.   BACKGROUND and CONTEXTUAL EVIDENCE

---

[1] 26 U.S.C. § 5845(a) defines "firearm" to include "(8) a destructive device." The term "destructive device" is further defined at 26 U.S.C. § 5845(f) to mean "(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade . . . or (F) similar device. . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which his neither designed nor redesigned for use as a weapon. . . ."

In proving its case, the Government plans to introduce background evidence regarding the string of events leading to the defendant's arrest for possessing an unregistered destructive device. The defendant attempts to preclude this narrative through its Motions in Limine, in particular, Motions 1, 6, and 7. (Doc. 33). These motions seek to exclude evidence related to the defendant's white supremacist past and current expressions, his residence in a halfway house, and his threats toward other individuals. The Government moves this court to deny these motions in limine because this part and parcel evidence is explanatory in nature, completes the story of the charged offense, and is inextricably intertwined with the charged crime.  *United States v. Wright*, 392 F.3d 1269, 1276 (11th Cir. 2004).

Regarding the defendant's first motion, the Government agrees that the defendant's past membership with a hate group or white supremacist organization is irrelevant. However, when the alleged destructive device was seized, the defendant was displaying a license plate containing swastikas and the words "Fuck America" is close proximity to the device. These expressions are temporally and physically related to the charged offense. They are also intimately connected with the subject of the defendant's seventh motion, relating to threats to individuals.

The defendant's co-workers are expected to testify that his conversations were replete with threats to various people. Among the recurring targets, the defendant listed his ex-wife and all the "niggers at the halfway house." Critically,

the Government expects at least one witness to testify that the defendant threatened to "blow up" the inhabitants of the halfway house. The threats are also an integral part of the story. On August 12, 2013, the date of the offense, the defendant did not show up from work. His coworkers began talking among themselves about the defendant's threats and strange behavior. This led to the discovery of the alleged destructive device.

Finally, the reason the defendant did not show up for work on August 12 was because he was confined to the halfway house for a rules violation. Also on that day, the defendant was interviewed by ATF Special Agent Jay Bagwell at the halfway house, and Agent Bagwell discovered a cellphone and a soldering iron in the defendant's room. These items are relevant to the defendant's possession of the destructive device and to claims he had made to coworkers about building a remote, cellphone detonated bomb. Further, many of the defendant's coworkers will testify that they first got to know him by picking him up from the halfway house to take him to work. Accordingly, exclusion of the events at the halfway house would remove a significant part of the offense conduct's narrative.

This evidence, which is linked in time and circumstance to the crime charged, not only forms a "natural part of an account of the crime," but pertains to "the chain of events explaining the context" of the offense charged and facts surrounding that charge.  *United States v. McLean,* 138 F.3d 1398, 1403 (11th Cir.

1998). Further, the defendant seeks to severely limit the case, even stating that he "has made no issue as to his knowing or intentional possession of the devise *[sic]*." (Doc. 35 at 3). But, a defendant "may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *United States v. Old Chief*, 519 U.S. 172, 186-87 (1997). Indeed, as the Court explained,

> [The] persuasive power of the concrete and particular is often essential to the capacity of jurors to satisfy the obligations that the law places on them. . . . When a juror's duty does seem hard, the evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment. Thus, the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.

*Id*. at 187-88 (citations omitted). Jurors are not required to consider the evidence in a complete vacuum. There is a difference between offering evidence to support a cohesive narrative describing the offense conduct and arguing that the defendant should be convicted because he is a bad person. The latter is impermissible. The Government merely seeks to do the former.

   b.  **The Defendant's Intent**

   The defendant's intent is woven throughout the above-discussed issues as well as the defendant's fifth motion in limine and his response (Doc. 35) to the

12

Government's 404(b) notice. He contends that, under *United States v. Hammond*, the critical inquiry is "whether the device, as designed, has any value other than as a weapon." 371 F.3d 776, 781 (11th Cir. 2004). Put another way, the Government must prove that the device possessed by the defendant is an explosive, plus that is has been designed as a weapon. (See Doc. 35 at 3). The defendant is correct in this.

However, he is incorrect in stating that this inquiry removes intent from the equation. The Eleventh Circuit has not settled the question of whether the defendant's subjective intent is relevant or irrelevant to determining whether the device was designed as a weapon. *See United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009). In *Spoerke*, the Eleventh Circuit declined to adopt a standard regarding subjective intent where the district court permitted evidence on this subject and instructed the jury under a "mixed standard" in line with a Seventh Circuit decision in *United States v. Johnson*, 152 F.3d 618, 628 (7th Cir. 1998). *Id.*

The *Johnson* decision, while not binding, is helpful. The Seventh Circuit reasoned that, generally, the "objective analysis"[2] will satisfy to determine whether the device falls within the ambit of the National Firearms Act, rendering the defendant's subjective intent regarding the device inappropriate. *Johnson*, 152 F.3d at 627. But, "if the objective design inquiry is not dispositive because the

---

[2] *I.e.*, whether the "objective design of the device or component parts indicates that the object may only be used as a weapon, i.e., for no legitimate social or commercial purpose." *Johnson*, 152 F.3d at 628. In such a case, the analysis is at an end: the device falls under the ambit of the NFA statute, and "subjective intent is not relevant." *Id.*

assembled device or unassembled parts may form an object with both a legitimate and an illegitimate use, then subjective intent is an appropriate consideration in determining whether the device or parts at issue constitute a destructive device under subpart (3)."[3] *Id.* at 628. The Government expects the evidence to present just such an ambiguity. The defendant has repurposed an automobile airbag inflation component – a legitimate device – to create a weapon. The defendant will likely argue that the alleged device is an otherwise legal product, or that it was only intended as a prank device. The jury will further hear conflicting expert testimony. Therefore, under these circumstances, the defendant's subjective intent is an appropriate factor for the jury to consider when determining what the design and purpose of the device was and whether it had any value other than as a weapon.

In the alternative, if the defendant's motions regarding intent are granted, then the court should also prohibit the defendant from testifying, introducing evidence, or arguing about his subjective intent. If this court determines that the objective analysis is suitable under these facts, then this determination should be equally applicable to both parties.

### c.  Evidence Admitted Under Fed. R. Evid. 404(b)

---

[3] Subpart (3) refers to the definition of a destructive device, set out *supra*. at n.1.

The Government also plans to offer evidence pursuant to Rule 404(b) of the *Federal Rules of Evidence* relating to Kircus' prior conviction for possession of a destructive device or pipe bomb. The Government filed its notice of intent to offer this evidence on February 24, 2014, in Document 29.Such evidence is admissible to show his intent, design, and absence of mistake or accident regarding the features of the alleged destructive device that made it subject to registration. If the critical question is whether the device was *designed* as a weapon, then intent is highly probative. If the defendant argues that he was unaware of the explosive qualities of his device, or that his device might function as a weapon, his prior conviction weighs against an inference that he made a mistake. Further, the defendant's coworkers will testify that he told them that he had been convicted of possessing a pipebomb. Their suspicions, which led them to the discovery of the destructive device, resulted from the confluence of the defendant's statements about his prior conviction and his threats against his ex-wife and the people at the halfway house.

### d. Rule 403

The defendant seeks to exclude the above-discussed evidence under Rule 403. To grant the defendant's motions in limine wholesale would abuse the rule. As quoted in *Spoerke*, "[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when <u>unfair</u> prejudice <u>substantially</u> outweighs probative

value that the rule permits exclusion." *Id*. at 1251 (emphasis original) (quoting *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983). The defendant has not shown that the dangers of unfair prejudice *substantially* outweigh the probative value of the evidence. Limiting instructions are available to cure potentially unfair prejudice, and they should be preferred because, as the Eleventh Circuit explained in *Walton*, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *Id.*

## STIPULATION

The parties will stipulate that the alleged destructive device was not registered to the defendant, or to anyone else, in the National Firearms Registration and Transfer Record database.

Respectfully submitted this the 26th day of February, 2014.

JOYCE WHITE VANCE
United States Attorney

*/s/ Electronic Signature*
E. WILSON HUNTER
Special Assistant United States Attorney

16

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 26th day of February, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the defendant's attorney of record.

               Respectfully submitted,

               */s/ E. Wilson Hunter*
               E. WILSON HUNTER
               Special Assistant United States Attorney